AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
04/03/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____GSA_____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
4/3/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____VV_____ DEPUTY

| | |
|---|---|
| United States of America,<br><br>v.<br><br>Ishak Belkacem Beliouz,<br>aka "Kemou Farun"<br><br>Defendant | Case No.   2:26-mj-01953-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of April 2, 2026, in the county of Los Angeles in the Central District of California, the

defendant violated:

*Code Section*

18 U.S.C. § 1029(a)(2)

*Offense Description*

Use of Unauthorized Access Devices

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Alexander Le, HHS-OIG Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   April 3, 2026

*Judge's signature*

City and state:   Los Angeles, California

The Hon. Maria A. Audero, U.S. Magistrate Judge
*Printed name and title*

AUSA: Monika Hara (x3519)

## AFFIDAVIT

I, Alex Le, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against ISHAK BELKACEM BELIOUZ ("BELIOUZ") for a violation of 18 U.S.C. § 1029(a)(2)(use of unauthorized access devices).

2.    This affidavit is also made in support of an application for a warrant to search a black and dark grey Apple iPhone with a red case, seized from BELIOUZ on April 2, 2026, (the "SUBJECT DEVICE") and currently in the custody of the U.S. Department of Health and Human Services, Office of Inspector General, and described in Attachment A.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 1028A (Aggravated Identity Theft), 1029 (Access Device Fraud), and 1344 (Bank Fraud) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless

specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent of the United States Department of Health and Human Services ("HHS"), Office of Inspector General ("HHS-OIG"), and I have served in this capacity since 2022.  I have completed a combined 16 weeks of formal education and training at the Federal Law Enforcement Training Center's Criminal Investigator Training Program in Glynco, Georgia, and HHS-OIG's Special Agent Basic Training program in Largo, Maryland.  This training included instruction in conducting investigations of access device, bank, and wire frauds, identity theft, and related crimes, and the use of computers, cell phones, and other electronics to commit these crimes.  My formal education also includes a B.A. from the University of California, Irvine, and a J.D. from the University of Southern California.  I have led and participated in many aspects of criminal investigations, including: collecting and reviewing physical and electronic evidence; conducting surveillance; utilizing informants; interviewing witnesses, subjects, and targets of investigation; and preparing and serving subpoenas, search and arrest warrants, and other legal process.

6.    As an HHS-OIG Special Agent, I am a federal law enforcement officer within the meaning of Title 5, Section 406 of the United States Code, in that I am empowered by law and authorized by the Attorney General to conduct investigations,

2

seek and execute warrants, and make arrests for federal offenses.

7.    I am currently assigned to investigate complex financial crimes involving HHS-funded programs in the Central and Southern Districts of California.  I am working in conjunction with the United States Secret Service on a Homeland Security Investigations ("HSI") task force.  The HSI task force is comprised of local, state, and federal law enforcement personnel, whose duties are to investigate cyber and financial crimes, including activity in connection with the fraudulent use of access devices, payment card skimming and re-encoding, identity theft, money laundering, and other frauds.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    Between January 2025 and January 2026, the California Department of Social Services ("CDSS") detected more than $60.9 million in stolen funds from victim Electronic Benefit Transfer ("EBT") cards.  This fraud is from two programs known as CalFresh and CalWORKs, which help low-income households pay for housing, food, and other necessary expenses.  Many of the fraudulent withdrawals are done at specific ATMs in the Central District of California.

9.    On April 2, 2026, beginning at approximately 6:00 a.m., law enforcement began physical surveillance in the vicinity of U.S. Bank located at 9460 Wilshire Blvd, Beverly Hills, CA 90212 (the "Target Bank"), which was identified by CDSS data as an ATM location with suspected EBT fraud.

3

10.  At approximately 6:10 a.m., law enforcement saw BELIOUZ using an ATM terminal located at the Target Bank. BELIOUZ withdrew approximately $1,140 in cash from the ATM using two unauthorized access devices.  BELIOUZ was then detained and found with approximately 55 access devices in his possession (later determined to be cloned California EBT cards, two of which had the same EBT card information BELIOUZ used to withdraw $1,140 in cash from the ATM).  BELIOUZ was then arrested and also found in possession of approximately $1,140 in cash and the SUBJECT DEVICE.

11.  BELIOUZ provided law enforcement with a name and date of birth other than his true name and birthdate.  Based on matches in U.S. immigration records, law enforcement positively identified BELIOUZ as a French national who had entered the U.S. on a visa waiver and remained in the U.S. longer than allowed.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

12.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   Regulatory Background of CalFresh and CalWORKs Programs**

13.  CDSS is a government agency that administers several benefit and assistance programs for residents of the state of California.  One of the assistance programs administered by CDSS is called CalFresh (formerly known as food stamps), which helps low-income households purchase food and household items to meet their nutritional needs.  Another assistance program

4

administered by CDSS is called CalWORKs, which helps low-income families with children pay for housing, food, and other necessary expenses.

14.  The U.S. Department of Health and Human Services, Administration for Children and Families, administers the Temporary Assistance to Needy Families ("TANF") program.  TANF is a federally funded assistance program that awards grants to individual states to support low-income families with children. In California, TANF grant funds are used to operate CalWORKs cash assistance.

15.  Residents of California that meet the criteria established by the CalFresh or CalWORKs programs can apply online for benefits at www.getcalfresh.org and www.benefitscal.com.  Beneficiaries apply for benefits by submitting their income and number of dependents to determine their benefit eligibility.

16.  CalFresh and CalWORKs benefits are issued through Electronic Benefit Transfer cards ("EBT cards").  EBT cards are mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions. For example, you can use an EBT card to make a purchase at a grocery or convenience store by swiping the card at a point-of-sale terminal.

17.  The EBT cards issued under CalFresh and CalWORKs are assigned specific Bank Identification Numbers ("BIN").  A BIN refers to the first five or six digits of the account number on a debit or credit card and can be used to identify the issuer of

5

the card, like CDSS, which administers the CalFresh and CalWORKs programs.

18. Benefits received through the program are typically disbursed to EBT cardholders by CDSS during the early days of each month. Those benefits are deposited directly from CDSS into the account of the EBT cardholder.

19. The EBT cardholders can then conduct cash withdrawals at ATMs using a personal identification number ("PIN") established by the card holder. The EBT cardholder presents the card at an ATM, inserts the card into the ATM card reader, and utilizes a PIN to withdraw the funds previously deposited by CDSS intended for beneficiaries of the CalFresh or CalWORKs programs.

**B.    Background on EBT Fraud in the Los Angeles Area and Prior State and Federal Operations**

20. Since in or about August 2022, local law enforcement has been working with CDSS to investigate a significant increase in unauthorized cash withdrawals utilizing EBT cards. Based on analysis of victim complaints to CDSS, victim complaints to local law enforcement, bank records, and surveillance, law enforcement determined that the majority of the unauthorized cash withdrawals were being conducted with cloned cards.

21. A cloned card can be a blank white plastic card or another debit, credit, or gift card that contains altered information on the card's magnetic stripe. Based on my training and experience, I know that suspects will often clone cards by taking stolen card information from a victim card's magnetic

6

stripe and re-encode that stolen information onto another card's magnetic stripe.  Cloning these cards allows the suspect to use the card and the CDSS benefits added on to the account linked to the card for illicit purchases or unauthorized cash withdrawals.

22.  On a legitimate debit or credit card, the information contained on the card's magnetic stripe will match the information embossed on the front of the card. This information includes the account number, expiration date, and cardholder's name, among other information.  Whereas on a cloned card, the information contained on the magnetic stripe will not match the information embossed on the front of the card.  For example, if a suspect re-encodes victim EBT card information onto a pre-existing gift card's magnetic stripe or a blank white plastic card with a magnetic stripe, the magnetic stripe will be encoded with the EBT card information, but the card itself will still bear the embossed information of the gift card or bear no information if it is a blank white plastic card.

23.  Based on my training, experience, and participation in this investigation, I know that the victim card data harvested to clone cards is often obtained from what is colloquially referred to as "skimming activity."

24.  The term "skimming" is used to describe activity that involves unlawfully obtaining debit and credit card information by using technological devices to surreptitiously record victim accountholders' debit and credit card numbers and PIN at, for example, ATMs or point-of-sale terminals.  For example, individuals conducting ATM "skimming" may install a skimming

7

device into the card reader of the ATM to record the debit or credit card numbers, as well as a camera or keypad overlay on the ATM keypad to record the associated PIN number.  Those individuals will then return to the ATM to collect the card number and PIN information stored on the installed device.

25.  As described above, suspects then manufacture cloned and fraudulent debit or credit cards that bear the victim account holder's account information that was obtained from skimming.  Once that information is loaded onto another fraudulent card (e.g., a gift card or blank plastic card), members of the scheme then use that fraudulent card to withdraw cash from the victim accountholder's bank accounts or to make purchases with the victim accountholder's account.

26.  In or about September 2022, local law enforcement conducted a surveillance and arrest operation in the Los Angeles, California area.  This operation was planned in response to the large number of unauthorized withdrawals occurring at ATMs in the Los Angeles area during a short period of time.  Specifically, law enforcement had analyzed fraudulent EBT withdrawal data and noticed a high volume of unauthorized withdrawals on specific dates and times that coincided with the dates when the majority of benefits are disbursed to EBT cardholders.

27.  As a result of this operation, local law enforcement established surveillance at select ATMs that were used to conduct a significant volume of EBT fraud.  Law enforcement surveilled those ATMs around the dates when benefits had been

disbursed, observed suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession, and arrested multiple individuals believed to be making fraudulent withdrawals of EBT benefits.  As a result, law enforcement arrested approximately 16 suspects.  All of the arrested suspects were later determined to be citizens of countries other than the United States who did not have documentation to be lawfully present in the United States.  All of the individuals arrested were released from local custody within hours of their arrest and absconded from any future judicial proceedings.

28.  In or about February 2023, in response to a further increase in unauthorized cash withdrawals utilizing EBT cards after the local law enforcement September 2022 operation, federal law enforcement conducted a similar surveillance and arrest operation in the Los Angeles, California area. Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs.  Law enforcement arrested three suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession.  Two of those defendants came to the ATM together, possessed 35 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that they had made more than $190,000 in past attempted fraudulent EBT withdrawals from a single bank since October 2022.  One additional defendant possessed 269 cloned EBT cards at the time of arrest, and later analysis of historic ATM

9

surveillance data showed that the defendant had made more than $70,000 in past attempted fraudulent EBT withdrawals from a single bank since January 2023.  All three of these defendants were determined to be citizens of Romania, who did not have documentation to be lawfully present in the United States.  The three arrested defendants were ordered detained pending trial by the Hon. Karen Stevenson and Hon. Margo A. Rocconi.  A federal grand jury returned two indictments against the three defendants for bank fraud, in violation of 18 U.S.C. § 1344; aggravated identity theft, in violation of 18 U.S.C. § 1028A; use of unauthorized access devices, in violation 18 U.S.C. § 1029(a)(2); and possession of unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), in 23-CR-0076-FLA and 23-CR-0077-JFW.

29.  From March 2025 through September 2025, federal law enforcement conducted multiple surveillance and arrest operations in the Los Angeles, California area.  Law enforcement arrested approximately thirty-nine suspects that conducted unauthorized EBT transactions.  At the time of their arrest, the suspects had in their possession cloned EBT cards, cash in illicitly obtained funds, and multiple skimming devices.  34 out of the 39 defendants were determined to be citizens of other countries, of which twenty-eight were Romanian citizens, the majority did not have documentation to be lawfully present in the United States.

10

C.      **Background of Current Operation to Combat EBT Fraud**

30.     The most current data provided by CDSS, based in part upon reported fraud by victims, indicates that between January 2025 and January 2026, more than approximately $60.9 million in cash benefits has been stolen from victim EBT cards throughout California.

31.     Of the more than approximately $60.9 million in cash benefits stolen during this year time period, more than approximately $30.6 million has been stolen from victim EBT cards, in the county of Los Angeles alone.  The majority of these funds were stolen through unauthorized ATM withdrawals.

32.     In the month of January 2026, according to data from CDSS, more than approximately $3.7 million was stolen from victim EBT cards largely through unauthorized ATM withdrawals. Of the approximately $3.7 million stolen from victim EBT cards in the month of January 2026, more than approximately $2.1 million was stolen, mostly through unauthorized ATM withdrawals, in Los Angeles County alone.

33.     Based upon my training and experience conducting access device fraud investigations, I know that suspects committing access device fraud schemes will often target particular BINs when harvesting stolen card information collected from skimming devices.  Thus, suspects using skimming devices may target the BIN associated with CDSS, in essence, targeting CalFresh and CalWORKs benefits.  Moreover, based upon my training and experience, the sheer volume of unauthorized ATM withdrawals occurring during the early days of the month is

11

further indicative that suspects participating in the fraud scheme at issue are targeting EBT cards because benefits are typically disbursed to EBT cardholders during the early days of each month.

34. Law enforcement has also reviewed ATM surveillance provided by financial institutions that administer EBT accounts that relate to the fraud scheme at issue. During the unauthorized ATM withdrawals, suspects can often be seen holding stacks of cards and conducting withdrawals in quick succession at one ATM. Based upon my training and experience, I know that suspects perpetrating access device fraud schemes will often conduct unauthorized withdrawals using cloned cards in rapid succession at ATMs.

35. Based upon the rapid succession of unauthorized ATM withdrawals being conducted, the fact that the cards being used to conduct the unauthorized cash withdrawals are nearly all cloned EBT cards, and the fact that nearly all of the unauthorized withdrawals are happening during the early days of the month, I believe that suspects participating in the fraud scheme at issue are ostensibly targeting EBT cards.

**D.   BELIOUZ Committed EBT Fraud Using Unauthorized Access Devices on April 2, 2026**

36. Based upon the large dollar amount being stolen from victim EBT cards, the number of victims impacted, the concentration of unauthorized ATM withdrawals occurring in particular areas, and the large number of unauthorized ATM withdrawals occurring at singular bank locations, law

12

enforcement in the Central District of California conducted a surveillance and arrest operation in April 2026.

37. Based upon my training and experience, I know that as an anti-fraud measure, CDSS places an embargo on EBT accounts, such that EBT cardholders are not able to conduct cash withdrawals from their EBT cards from approximately 12:00 a.m. to 6:00 a.m., on the morning that their funds load (i.e., the 1st, 2nd, or 3rd of the month, depending on the account).

38. On April 2, 2026, beginning at approximately 6:00 a.m., law enforcement began surveillance in the vicinity of the Target Bank.

39. At approximately 6:10 a.m., based on my physical observation, BELIOUZ was standing in front of an ATM inside a vestibule at the Target Bank. Law enforcement observed BELIOUZ interact with the ATM by inserting cards, touching the screen and keypad, and retrieving cards and cash. BELIOUZ did this several times in rapid succession. Simultaneously, law enforcement was alerted by card processing industry representatives that multiple transactions, each involving a different EBT card account, were occurring at the Target Bank. Two transactions were successful cash withdrawals totaling $1,140.

40. Based on the date, time, ATM location, presence of successive ATM transactions on EBT cardholder accounts, law enforcement detained BELIOUZ in order to investigate further.

41. At the moment he was detained, BELIOUZ was in the middle of conducting another transaction at the ATM. He was

13

holding the SUBJECT DEVICE and an access device card that had a colored sticker with numbers written on it.  From my prior experience investigating individuals committing access device fraud, I know that it is common for criminals to affix stickers to cloned access device cards that feature the PIN and amount of money available on a compromised account to facilitate the efficient use of multiple cards in a row at an ATM.  Law enforcement ultimately placed BELIOUZ under arrest.

42.  During a search of BELIOUZ's person incident to arrest, law enforcement found approximately $1,140 in U.S. currency and 55 access devices including Visa, Paypal, Mastercard, American Express gift and debit cards.  The access devices had stickers placed on them with handwritten numbers of what appeared to be, based on my training and experience, victim PINs, card balances, or both.  Below is a photograph of the cash and access devices that were seized from BELIOUZ during his arrest.



14

43. Law enforcement analyzed the magnetic stripes of the 55 access devices mentioned above and determined that all the access devices were encoded with California EBT BINs. Moreover, each of the cloned cards was confirmed to be affixed with a sticker bearing victim PINs, account balances, or both, that closely corresponded to each cloned card and withdrawal amount. These numbers were required in order to conduct the unauthorized ATM withdrawal.

44. Based on my review of preliminary transaction data for the Target Bank ATM, during the time when BELIOUZ was at the ATM, there were at least two withdrawals involving two different EBT card numbers – which matched two EBT card numbers encoded on two cloned cards seized from BELIOUZ incident to his arrest. Those two transactions totaled $1,140 in financial loss and BELIOUZ was arrested with $1,140 in his possession.

45. BELIOUZ advised law enforcement that his name was "Kemou Farun" with a birthdate in November 2003. Law enforcement searched U.S. Immigration and Customs Enforcement databases and found BELIOUZ's true name and birthdate, both of which were different than what he had provided. Law enforcement also learned that he was a French national with no current lawful status to be present or remain in the United States.

46. Due to the volume of cloned EBT cards recovered and the potential amount of EBT accounts affected, law enforcement is still in the process of identifying victim cardholders and confirming that none of the cloned EBT cards EBT cards in BELIOUZ's possession were encoded with EBT accounts that

15

belonged to him.  However, due to his immigration status, BELIOUZ should be ineligible for CalFresh or CalWORKs benefits under federal law.

47.  When law enforcement contacted BELIOUZ at the Target Bank ATM, he was holding the SUBJECT DEVICE and a cloned access device card while interacting with the ATM.  The screen of the SUBJECT DEVICE was illuminated with colors, text, and content that was different than what appeared on phone's lock screen, which indicates that BELIOUZ was actively using the SUBJECT DEVICE at the time.  The SUBJECT DEVICE was retrieved from the ledge of the ATM, where it and the cloned access device card was placed while BELIOUZ was being taken into custody.  The SUBJECT DEVICE was secured and transported to the U.S. Department of Health and Human Services, Office of Inspector General, where the device is securely held pending issuance of a search warrant.

## V.  TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT CRIMES

48.  Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft, I know the following:

a.  It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions

16

electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

b.    Oftentimes identity thieves take pictures of items reflecting their stolen identities, including items retrieved from stolen mail or mail matter, with their cellphones.

c.    It is also common for identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.  Identity thieves often keep such information in their cars, storage units, and in their digital devices.

d.    It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips

17

for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. These types of devices are routinely kept where the person will have easy access to such devices, such as on their person or in their cars or homes or storage units. Software relevant to such schemes can also often be found on digital devices, such as computers.

        e.    Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business. Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

49.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

50.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally,

18

when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

19

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

51.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

52.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

20

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BELIOUZ's thumb and/or fingers on the device; and (2) hold the device in front of BELIOUZ's face with

21

his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

53.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  <u>CONCLUSION</u>

54.   For all of the reasons described above, there is probable cause to believe that BELIOUZ committed a violation of 18 U.S.C. § 1029(a)(2) (use of unauthorized access devices). There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE as described in Attachment A.

Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone on
this 3rd day of April, 2026.

_____
THE HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE

22